Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

    *Plaintiff*,

    v.

COREY GRANT,

    *Defendant*.

Crim. No. 90-328

**OPINION**

**John Michael Vazquez, U.S.D.J.**

    This matter comes before the Court by way of Defendant Corey[1] Grant's motion for compassionate release. D.E. 62. The Government filed opposition, D.E. 73, to which Grant replied, D.E. 76. The parties made additional submissions, which included the Defendant's position as to the Third Circuit's decision in his appeal of his resentencing. D.E. 78. The Government provided an update as to two recent circuit opinions, D.E. 81, and Defendant responded with his view of those cases, D.E. 82. At the Court's request, Defendant also submitted a letter as to his vaccination status. D.E. 86. Defendant argues that he should be released because of COVID-19 and his hypertension, obesity, and diabetes. Both sides also spend a great deal of time on the Section 3553(a) factors. The Court reviewed the parties' submissions[2] and considered

---

[1] In different areas of the docket, Grant's first name is also spelled "Cory."

[2] Defendant's brief in support of his motion is referred to as "Br." (D.E. 62); the Government's opposition brief is referred to as "Opp." (D.E. 73); Defendant's reply brief is referred to as "Reply." (D.E. 76). The remaining submissions will be referred to by their docket entry ("D.E.") number.

the motion without oral argument pursuant to Local Criminal Rule 1.1 and Local Civil Rule 78.1(b). For the following reasons, Defendant's motion is denied.

I. BACKGROUND

A. Criminal Proceedings

1. Trial and First Sentencing

In March 1987, law enforcement began investigating a street gang, the "E-Port Posse," led by Bilal Pretlow. 2016 Presentence Investigation Report ("PSR") ¶ 45. The E-Port Posse distributed large quantities of cocaine and marijuana in Elizabeth and Linden, New Jersey, among other areas. *Id.* ¶ 47. The group obtained multi-kilogram quantities of cocaine from New York, and then cut, packaged, and distributed the cocaine through street dealers, known as "clockers." *Id.* ¶ 58. The gang protected its business through violence and threats of violence. *Id.* Grant was recruited into the organization when he was a minor and was an "enforcer." *Id.* ¶ 52. In addition to Grant, the E-Port Posse regularly recruited juveniles to package cocaine at stash houses and then sell the drugs. *Id.* ¶ 60.

The gang was violent. Melanie Baker[3] was shot four times in the head and found dead on June 14, 1989. *Id.* ¶ 67. The Government introduced evidence that Grant was involved in the murder. *Id.* ¶¶ 69-72. Also in 1989, the E-Port Posse learned that one of its members, Mutah Sessoms, was cooperating with law enforcement. *Id.* ¶ 73. On June 16, 1989, Grant picked Sessoms up and drove him to an apartment in East Orange, New Jersey. *Id.* ¶ 74. Once there, Pretlow and other gang members confronted Sessoms about his cooperation while pointing firearms at him. *Id.* ¶¶ 74-75. Sessoms was assaulted, with Grant putting Sessoms in a choke

---

[3] The motive for Baker's killing is not clear, although she may have seen Bilal Pretlow and another person with drugs and money, so Pretlow determined that she was a security risk. *Id.* ¶ 68.

hold; Irvin Bethea then hit Sessoms in the head with a hammer. *Id.* ¶ 76. Robert Pretlow (Bilal's brother) then killed Sessoms with a machete. *Id.* Sessoms' body was cut into pieces. *Id.* ¶ 77. Grant went with Bilal Pretlow to buy suitcases for various body parts to be hidden in and disposed of. *Id.* ¶ 78.

On August 20, 1989, Grant and other gang members confronted Dion Lee, a local drug dealer, and informed Lee that he could not ply his trade in a certain housing project unless he did so for the E-Port Posse. *Id.* ¶¶ 81-83. A struggle ensued, and Grant struck Lee in the head with a gun. *Id.* ¶ 83. Lee then began to run, and Grant and another confederate shot at him, but only managed to pierce Lee's pant leg. *Id.* A few days later, on August 28, 1989, Grant and another gang member approached Dion's brother, Mario Lee. *Id.* ¶ 84. Like Dion, Mario was warned that he could not sell drugs in the areas unless he worked for Pretlow's gang. *Id.* Mario, like Dion, ran away, but Grant's companion (James Holman) shot Mario in the neck and killed him. *Id.* ¶ 85.

During the aforementioned violent activity, Grant was either 15 or 16 years old.

Grant, along with numerous other members of the E-Port Posse, were indicted. The Government sought the death penalty against Bilal Pretlow, so his case was severed. While Pretlow's case was underway, he killed himself. *Id.* ¶ 37. Grant then went to trial with co-defendants Bethea and Vincent Jackson. On May 13, 1992, Grant was convicted by a jury of the following: (1) Count One – Racketeer Influenced Corrupt Organization ("RICO") conspiracy in violation of 18 U.S.C. § 1962(d); (2) Count Two - RICO of racketeering act two (murder of Mario Lee), act five (attempted murder of Dion Lee), acts seven a and b (conspiracy with intent to distribute controlled dangerous substances ("CDS") and possession with intent to distribute CDS), act eight (possession with intent to distribute CDS), act nine (possession with intent to distribute CDS) in violation of 18 U.S.C. § 1926(c); (3) Count Four – conspiracy to distribute and possess

with intent to distribute in violation of 21 U.S.C. § 846; (4) Count Five – possession with intent to distribute CDS in violation of 21 U.S.C. § 841(a)(1); (5) Count Six – possession with intent to distribute CDS in violation of 21 U.S.C. § 841(a)(1); and (6) Count Eleven – possession of a firearm during and in connection with a crime of violence or drug trafficking offense in violation of 18 U.S.C. § 924(c). *Id.* ¶ 16. As to Count Two, Grant was acquitted of act three (the murder of Melanie Baker), and the jury could not reach a verdict on act one (the murder of Mutah Sessoms) or act six (the attempted murder of another individual). *Id.*

On November 9, 1992, the Honorable Harold A. Ackerman, U.S.D.J., sentenced Grant to life imprisonment on each of Counts One and Two; 40 years on each of Counts Four, Five, and Six; and 5 years on Count Eleven. *Id.* ¶ 19. All sentences ran concurrently, with the exception of that for Count Eleven, which ran consecutively. *Id.* Grant's conviction and sentence were affirmed on appeal. *United States v. Grant*, 6 F.3d 780 (3d Cir. 1993), *cert. denied*, 510 U.S. 1061 (1994). Grant's *pro se* petition for *habeas corpus* was denied. *Grant v. United States*, No. 06-5952, 2008 WL 360982 (D.N.J. Feb. 8, 2008).

### 2. *Miller* and Resentencing

In 2012, the United States Supreme Court decided *Miller v. Alabama*, 567 U.S. 460 (2012). In *Miller*, the Supreme Court ruled that mandatory life sentences for minors violated the Eighth Amendment's cruel and unusual punishment clause. *Id.* at 489. In October 2012, Grant filed a second *habeas* petition and an application to file a successive petition, which the Third Circuit granted. Grant argued that his mandatory life sentence on Counts One and Two violated the Eighth Amendment in light of *Miller*. The Honorable Jose L. Linares, U.S.D.J., granted Defendant a new sentencing hearing.

In preparation for his resentencing, Grant submitted a plethora of materials as to mitigation. Grant was born in Newark in 1973. PSR ¶ 168.[4] When he was less than a year old, Grant's grandmother, Shirley Grant, obtained legal custody of him. *Id.* Grant's mother, Valerie Grant, was 16 and addicted to drugs at his birth. *Id.* Grant's grandmother provided for him and also frequently brought him to church, where he became an accomplished drum player. Def. Br. at 3. Grant did not know his father, Edward Jackson, at the time, but Jackson was a drug dealer and user who spent most of his adult life incarcerated. PSR ¶ 168. When Grant was 11, his mother took him to meet his father in prison. *Id.* ¶ 169. Grant recalled the time with his father as the happiest of his life. However, Jackson absconded (in front of Defendant) from a halfway house by taking Valerie Grant's car, Jackson continued to use and sell drugs in front of Defendant, and Jackson was shot while with Grant (with Jackson throwing himself over Grant to protect him). *Id.* ¶ 170. Jackson did not seek medical treatment because of his escape status; he died a few days after being shot. *Id.*

As noted, Grant was initially raised by his grandmother. However, when he was 14, his grandmother sought assistance from the then New Jersey Division of Youth and Family Services ("DYFS") due to Defendant's behavior.[5] *Id.* ¶¶ 172, 175. Grant had been disruptive in school and at home; he would leave for days at a time and return without demonstrating remorse for his

---

[4] For ease of reference, the Court refers to the PSR for the mitigating facts. However, the Court has separately reviewed D.E. 63 and the exhibits (A through FF) attached thereto. The Court does separately cite to the certification of David Glazer, Esq. D.E. 63, Ex. N.

[5] Defendant submits that his grandmother contacted DYFS when she learned of his connection to the Pretlow organization. Br. at 17. Defendant also indicates that at age 11, his mother brought him to live with her and her male companion. *Id.* at 4. Grant reports that his mother and her companion both had substance abuse problems and that he was often without adequate food or clothing. *Id.* These facts are not clear from the PSR, but the Government does not contest them. As a result, the Court assumes them to be true for purposes of the current motion.

5

absences. *Id.* ¶ 175. Grant then received psychological counseling at Newark Beth Israel Hospital from February through December 1987. *Id.* A social worker reported that the death of Grant's father had a "profound effect" on Defendant. *Id.* At other points in 1987, Grant was uncooperative with caseworkers and stopped attending an enrichment program. *Id.* ¶ 176. In 1988, DYFS referred Grant and his family to the Family Preservation Program, and the family made progress. *Id.* ¶ 177. Also, in June 1988, DYFS determined that a residential program was not appropriate for Grant because the family had not first tried other community programs. *Id.* ¶ 178. In September 1988, DYFS determined that Defendant could be placed in a residential program. Because Grant was in a detention center at the time, DYFS could not initially locate him. *Id.* However, Grant later refused to enter the residential program because it was out of state. *Id.* DYFS then attempted to secure Grant's admission in a halfway house for adolescent males but he was again in a juvenile detention center. *Id.* In April 1989, the Grant family determined that residential placement was not needed. *Id.*

David Glazer also submitted a certification for the resentencing. D.E. 63, Ex. N. Glazer represented Grant during his trial and also represented him at the resentencing. Glazer recounted that before Grant's trial, Bilal Pretlow told Grant not to cooperate and not to speak with his counsel. Because Pretlow was incarcerated, he did so through intermediaries, including Grant's mother. *Id.* ¶¶ 7-8. Glazer indicates that in plea discussions with the Government, the Government indicated that if Grant cooperated, Grant could receive 20-25 years without testimony and 10-15 years with testimony. *Id.* ¶ 11. However, it was clear to Glazer that Grant would not cooperate. *Id.* ¶ 10. Glazer believed that Grant's refusal was due to both loyalty and fear (fear of retaliation from Bilal Pretlow and others, and loyalty in that he did not want to help the Government put Pretlow to death). *Id.* ¶ 10. After indictment, the prosecutor again informed Glazer that with cooperation,

6

Grant was likely to receive a 15-year sentence but was facing 30 to life without cooperation. *Id.* ¶ 13. After Bilal Pretlow committed suicide, the Government offered Grant a term of 30 years. *Id.* ¶¶ 19-21. Not only did Grant refuse to accept the offer, his grandmother, aunt, and mother were also against it. *Id.* ¶ 22.

While imprisoned, and before resentencing, Grant completed numerous BOP courses, including victim impact and awareness, conflict intervention, anger management, job search skills, and effective interviewing skills. PSR ¶ 165. Grant also accumulated 52 disciplinary infractions. *Id.* ¶ 166. The vast majority of the infractions concerned improper use of a phone or the mail. *Id.* However, Grant also was disciplined for fighting (twice), refusing to obey an order (considered "Disruptive Conduct – Moderate"), along with other infractions. *Id.*

### a. Resentencing

On September 27, 2016, Judge Linares resentenced Grant. 9/27/16 Sent. Tr. at 1. Glazer represented Grant, and two attorneys also appeared on behalf of the American Civil Liberties Union of New Jersey. *Id.* at 2. Judge Linares discussed the implication of *Miller*:

> The spirit of *Miller* is that courts should consider as a sentencing factor the youthfulness of the offender and recognize, right, that minor and youthful offenders have other psychological consideration that are not present in adult sentences, right? Such as the fact that they are more impressionable, the fact that they are more impulsive, the fact that their decision-making process is different, right?
> All of those factors, which I am going to consider, but that is what it was about with regard to life sentences.

*Id.* at 11. Judge Linares also indicated that he was going to contemplate the factors under 18 U.S.C. § 3553(a): "I am going to consider *Miller*, *Montgomery*, and I am going to consider the 3553 factors[.]" *Id.* at 23.

7

Grant sought a sentence of 32 years which, by his calculation, would have entitled to him to immediate release when good time credits were considered. *Id.* at 53. In support, Glazer argued all the events of Grant's life that he thought should be considered in light of *Miller*. *Id.* 64-65, 67-68. Among other things, Glazer pointed to Defendant's age at the time of the offenses, Defendant's lower comprehension, Defendant's thinking at the time, his grandmother's efforts with DYFS, his psychological treatment, and Bilal Pretlow's manipulation of minors *Id.* Glazer also noted the improvements that Grant had made while incarcerated. *Id.* at 70-72. Grant apologized for his offenses, noted that he did not actually comprehend his destructive behavior until he was in his mid-20s, and reviewed the steps that he had taken to rehabilitate himself. *Id.* at 86-88.

The Government sought another life sentence, emphasizing that Defendant was "an enforcer and one willing to use brutal violence to achieve the E-Port Posse's objectives." *Id.* at 91, 98. The Government further argued that under the preponderance of the evidence standard, Defendant should also be held responsible at sentencing in the murders of Melanie Baker and Mutah Sessoms. *Id.* at 91, 93.

In sentencing Grant, Judge Linares concluded this matter "was not the rarest of exception[s] referenced in *Miller*, where the lifetime without parole is appropriate[.]" *Id.* at 119. In so finding, Judge Linares considered Grant's age at the time of the offenses, his upbringing, the limited decision-making of a minor, his impulsivity, and his ability to be influenced by Pretlow. *Id.* at 118, 122. As to Defendant's role in the drug offenses, Judge Linares found that Grant played a greater role than the "clockers." *Id.* at 120. Judge Linares then discussed Grant's role in the violent acts, noting that his actions were "horrendous." *Id.* at 121, 122. The court further considered the nature of the victims. *Id.* at 122. Judge Linares concluded that the sentence proposed by Defendant was not

8

> appropriate under the circumstances of this case. I don't think that it would capture the seriousness of the drug charges combined with the gun charge, plus what is tantamount, one murder conviction, one attempted murder conviction, and the relevant conduct in which he was involved [in] the other murders, which I am convinced by a preponderance of the evidence presented at the trial he was involved in.

*Id.* at 123. Judge Linares sentenced Grant to 60 years each on Counts 1 and 2; concurrent with 40 years each on Counts 4, 5, and 6; and a consecutive 5 years on Count 11. *Id.* D.E. 39.

### b. Resentencing Appeal

The Third Circuit initially found that that Grant's sentence of 65 years violated *Miller* as a *de facto* sentence of life without parole ("LWOP"). *United States v. Grant*, 887 F.3d 131, 143-53 (3d Cir. 2018). Sitting *en banc*, however, the Circuit disagreed with the initial panel. *United States v. Grant*, 9 F.4th 186 (3d Cir. 2021) (*en banc*). The Third Circuit first concluded that Grant's sentence, even if it amounted to *de facto* LWOP, did not violate *Miller* and its progeny. *Id.* at 193. The *Grant* court ruled that a later Supreme Court case confirmed that "*Miller* requires only discretionary sentencing, not particular findings or outcomes." *Id.* at 196 (citing *Jones v. Mississippi*, 593 U.S. __, 141 S. Ct. 1307, 1322 (2021)). The court in *Grant* then concluded that Grant had received the required procedure under *Miller*. *Id.* at 197. The Third Circuit observed that the district court had imposed the sentence after giving due consideration to *Miller*, emphasizing that a trial court need not "make any specific findings or incant any particular words *en route* to imposing" a sentence. *Id.* at 198.

Grant also argued that the sentencing judge had violated the sentencing-package doctrine, which "recognizes 'a strong likelihood that the district court will craft a disposition in which the sentence on the various counts form part of an overall plan.'" *Id.* at 199 (quoting *United States v. Davis*, 112 F.3d 118, 122 (3d Cir. 1997)). Grant argued that the district court should have

9

resentenced him on all counts, rather than just the two that violated *Miller*. *Id.* The court in *Grant* noted that the Third Circuit had never applied the doctrine to matters in which only sentences, rather than convictions, had been overturned. *Id.* at 200. And, the Circuit continued, *Miller* only required that Grant be resentenced on two counts; the convictions themselves were not vacated. *Id.* at 199. Because defense counsel had not properly preserved the issue as to the sentencing package doctrine, the Circuit concluded that no plain error had occurred. *Id.* at 200.

Grant is currently in FCI Schuylkill and has an anticipated release date of December 17, 2045.

### B. COVID-19 Pandemic

COVID-19 "is caused by the virus severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), a new virus in humans causing respiratory illness which can be spread from person-to-person." *Coronavirus Disease 2019 (COVID-19)*, "COVID-19 Overview and Infection Prevention and Control Priorities in non-US Healthcare Settings," Centers for Disease Control and Prevention (Aug. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/non-us-settings/ overview/index.html#background. "COVID-19 is primarily transmitted from person-to-person through respiratory droplets. These droplets are released when someone with COVID-19 sneezes, coughs, or talks." *Id.* Persons who contract the virus reflect a wide range of symptoms from asymptomatic to mild (including fever, cough, nausea, chest pain, and body pain) to severe to critical (including respiratory failure and death). *Id.* Currently, there is no known cure for COVID-19. As a result, standard precautions to prevent the spread of the virus include social distancing, proper hygiene, personal protective equipment (including use of a face mask), and maintenance of clean surfaces and devices. *Id.*

Numerous factors can increase a person's risk of severe illness if he/she contracts the virus. As a person get older, his/her risk for severe illness from COVID-19 increases. *COVID-19*, "Older Adults," Centers for Disease Control and Prevention (May 14, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html. For example, persons in their sixties and seventies are at a higher risk than people in their fifties. *Id.* Those 85 or older are at greatest risk. *Id.* Adults 65 or older comprise 8 out of 10 COVID-19 deaths in the United States. *Id.* The following medical conditions put a person at increased risk of severe illness from COVID-19: cancer, chronic kidney diseases, chronic lung diseases (including asthma if it is moderate to severe), dementia or other neurological conditions, heart conditions such as coronary artery disease, weakened immune system from organ transplant, obesity, pregnancy, sickle cell disease, smoking, stroke or cerebrovascular disease, and type 2 diabetes mellitus. *COVID-19*, "People with Certain Medical Conditions," Centers for Disease Control and Prevention (May 13, 2021),[6] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

As of January 18, 2022, the United States had 66,715,937 COVID-19 cases, resulting in 850,575 deaths. *CDC COVID Data Tracker*, "United States COVID-19 Cases and Deaths by State," https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited Jan. 18, 2022).

### C. Federal Bureau of Prisons

The Federal Bureau of Prisons ("BOP") has taken the following steps to combat the virus. On March 13, 2020, the BOP modified its operations in accordance with its "COVID-19 Action

---

[6] The CDC previously provided two separate lists, one listing conditions that entailed a greater risk of severe illness and one setting forth conditions that might involve a greater risk.

11

Plan." *Federal Bureau of Prisons COVID-19 Action Plan*, Federal Bureau of Prisons (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp. Initially, all social visits, inmate movement, and official staff travel were suspended for thirty days. *Id.* Contractors who enter any BOP facility are screened for the virus, and initially admission was limited to contractors who performed essential services. *Id.* The BOP also conducts enhanced health screenings for staff in areas of "sustained community transmission." *Id.* The BOP screens all new inmates for virus "exposure risk factors and symptoms." *Id.* Any new inmate who is asymptomatic but has had a risk of exposure is quarantined. *Id.* According to the Government, the quarantine period is for a minimum of fourteen days or until cleared by medical staff. Opp. at 5. The Government indicates that new inmates who are symptomatic are placed in isolation until they test negative for the virus or are cleared by medical staff. *Id.* The Government also states that the BOP has taken the following steps to prevent the spread of the virus: group gatherings are limited to permit social distancing as much as possible, all staff and inmates have been issued face masks, and all staff and inmates are strongly encouraged to wear face masks when social distancing cannot be achieved. *Id.*

The BOP also has a COVID-19 vaccination plan. *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Mar. 11, 2021), https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf. Inmates fall into different priority levels for vaccination: Priority Level 1 (for inmates in certain high priority jobs, including health service unit assignments); Priority Level 2 (inmates who are 65 or older, or who are, according to CDC criteria, at an increased risk for severe illness from the virus); Priority Level 3 (inmates who are aged 50 through 64 or who might be, according to CDC criteria, at an increased risk for severe illness from the virus); and Priority Level 4 (all other inmates). *Id.* As of January

18, 2022, the BOP had administered 285,713 doses of vaccine. *COVID-19*, "Vaccine Implementation," Federal Bureau of Prisons, https://www.bop.gov/coronavirus/index.jsp (last visited Jan. 18, 2022).

As of January 18, 2022, the BOP COVID-19 statistics are as follows: (1) currently, 9,194 inmates and 1,150 staff have confirmed positive tests; (2) 41,443 inmates and 9,136 staff have recovered; and (3) 277 inmates (11 while on home confinement) and 7 staff have died. *COVID-19 Cases*, Bureau of Prisons (last visited Jan. 18, 2022), https://www.bop.gov/coronavirus/index.jsp. FCI Schuylkill – where Defendant is housed – currently has 31 positive inmates and 3 positive staff members. *Id.* In addition, 415 inmates and 73 staff have recovered. *Id.* The facility has not reported any deaths due to COVID-19. *Id.*

### D. Grant's Other Relevant Background, Activities, and Conditions

Defendant is 48 years old and suffers from hypertension and diabetes for which he takes medication. He is also obese. He asks to be released due to his conditions and the impact that COVID-19 has had at FCI Schuylkill. Br. at 30-14. When Grant first filed his motion, he was housed at FCI Raybrook but had requested a transfer to FCU Schuylkill, which has since occurred. *Id.* at 16-28. Grant reports that he has received two doses of the vaccine but also indicates that FCI Schuylkill is currently on lockdown due to COVID-19 cases. D.E. 86 at 1. Defendant also argues that the factors under 18 U.S.C. § 3553 support his release. Def. Br. at at 47-52.

The Government opposes Defendant's motion, arguing that Defendant has not shown extraordinary and compelling reasons to justify his release. Opp. at 22. The Government indicates that after the initial COVID-19 surge, the BOP has become better equipped to address the virus, pointing to the BOP's vaccine program as an example. *Id.* The Government strenuously asserts that the Section 3553(a) factors countenance against Grant's release. *Id.* at 9-21.

13

Defendant wrote to the Warden of FCI Ray Brook, seeking his release for the same reasons he raises now. The Warden did not respond within 30 days.

## II. LEGAL STANDARD

Following the passage of the First Step Act, Section 3582(c)(1)(A) now reads as follows:

> (c) Modification of an imposed term of imprisonment. The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), *after considering the factors set forth in section 3553(a)* to the extent that they are applicable, if it finds that—
>
> (i) *extraordinary and compelling reasons warrant such a reduction*; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and *a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g)*;
>
> *and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission*; and
>
> (B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure; and
>
> (2) in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction

14

>is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A) (emphases added). The Government does not contest that Defendant has satisfied the statutory exhaustion requirement.

The applicable policy statement of the United States Sentencing Commission is found in Section 1B1.13. U.S. Sentencing Guidelines Manual § 1B1.13 (U.S. Sentencing Comm'n 2018). The application notes to the section provides four circumstances that can be considered extraordinary and compelling: (1) the medical condition of the defendant, (2) the age of the defendant, (3) family circumstances, and (4) other circumstances constituting an extraordinary or compelling reason, either considered alone or in combination with any of the other three stated reasons. *Id.* cmt. n. 1(A)-(D). In *United States v. Andrews*, 12 F.4th 255, 259-60 (3d Cir. 2021), the Third Circuit found that the policy statement was not binding on courts but nevertheless found that the statement could provide useful guidance.

Pursuant to Section 3582(c)(1)(A), the Court must also consider the factors listed in 18 U.S.C. § 3553(a). They include the nature and circumstances of Defendant's offense, the history and characteristics of Defendant, the need for the sentence to provide just punishment, and the need to protect the public from future offenses of Defendant. *Id.*

### III.  ANALYSIS

The Court finds that Grant has not met his burden of demonstrating extraordinary and compelling reasons to justify his release. The Court also finds that Grant has failed to show that the Section 3553(a) factors support his release.

Turning first to Defendant's arguments concerning the pandemic, his obesity and diabetes certainly put him at an increased risk should he contract COVID-19. However, his hypertension and diabetes are controlled with prescription medication. Importantly, Grant has since been

vaccinated, which not only increases his chances against infection but also helps protect against severe illness should he be infected. *COVID-19*, "Omicron Variant: What You Need to Know," Centers for Disease Control and Prevention, (last visited January 12, 2022), https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html. Finally, while there are a number of positive cases currently at FCI Schuylkill, the institution has avoided any deaths (of either inmates or staff). And, unfortunately, the increased infection rate reflects a surge of positive cases in American society as a whole due to the Omicron variant; such surges are not limited to BOP facilities. *See, e.g.*, "Omicron is spreading at lightning speed. Scientists are trying to figure out why," npr (Dec. 31, 2021), https://www.npr.org/sections/goatsandsoda/2021/12/31/1067702355/omicron-is-spreading-like-wildfire-scientists-are-trying-to-figure-out-why.html.

However, even if Grant had demonstrated extraordinary and compelling circumstances, the Court would nevertheless deny his motion under Section 3553(a). Grant undoubtedly had a difficult childhood, particularly starting at around age 11 when his mother took him back into her custody. Grant's father, an addict and a career criminal, was shot in front of Grant and then died a few days later. Grant's mother and her companion were also addicts who did not provide the necessities of clothing and food. So Grant turned to the streets and found a manipulator in Bilal Pretlow. In addition, Grant has completed numerous programs through the BOP, and the programs include behavioral, social, and labor skills. All of these facts militate in Grant's favor. On the other hand, Grant also had positive aspects to his formative years. His grandmother raised him in a loving home, and his grandmother sought DYFS' help in 1984 when she learned that Grant was with the Pretlow organization. And while Defendant portrays himself as a victim of DYFS and the system, there were also constructive moments. He was provided with psychological help. He

was provided with an enrichment program, which he stopped attending. His family was approved, and attended, a six-week Family Preservation Program in which they showed progress. Ultimately, he was approved for a residential program (only a few months after he was initially denied) but he refused to attend because it was out-of-state. DYFS then tried to place him in a halfway house for adolescents, but he was in juvenile detention. Upon his release, his family decided that they were no longer interested in a residential program. The decision not to accept the help offered by DYFS cannot be blamed on DYFS.

  And Grant's crimes were among the most serious and violent in our criminal justice system. He was found guilty of two RICO predicate acts of murder and attempted murder. Judge Linares, on resentencing, also found by a preponderance of evidence that he was involved in the murders of Walker and Sessoms. Walker was shot four times in the head, perhaps because she merely saw Bilal Pretlow with drugs and money. Sessoms was literally hacked to death with a machete, after Defendant tried to choke him unconscious, and Sessoms' body was then cut into pieces and hidden in luggage. All of these were separate acts on separate occasions; Grant was involved in ending the lives of three people and an attempt to end the life of a fourth. Grant was not merely a packager or clocker, he was an enforcer on numerous occasions.

  Moreover, even after being charged, Grant was provided with an opportunity to cooperate and potentially cut his sentence dramatically. He refused, and his attorney opines that it was due to both a sense of fear and loyalty. Assuming this to be the case, after Pretlow killed himself, the Government still extended an offer of 30 years. At that point, Defendant no longer had concerns about loyalty and fear; Pretlow was dead. But Defendant, his mother, his grandmother, and other family members would not consider the offer. In hindsight, that was a terrible decision for Grant. But at the time, he was an adult – no longer a juvenile.

Finally, Grant is not eligible for release for approximately 24 years, which weighs against granting his motion. *See United States v. Pawlowski*, 967 F.3d 327, 330-31 (3d Cir. 2020) (ruling that in deciding a motion for compassionate release, a district court may consider the amount of time remaining on a defendant's sentence).

With the exception of the last several years, all the information that Grant now presents to the Court was considered by Judge Linares at the resentencing. And Judge Linares considered the information. The entire Third Circuit upheld Judge Linares' sentence on appeal. The Court is well aware that Grant wanted less time, but nothing that Grant has done in the last several years would cause the Court to alter Judge Linares' sentencing decision.[7]

## IV. CONCLUSION

For the foregoing reasons, the Court denies Defendant's motion. An appropriate Order accompanies this Opinion.

Dated: January 19, 2022

John Michael Vazquez, U.S.D.J.

---

[7] Defendant argues that the Third Circuit's *en banc* decision demonstrates that Judge Linares did not properly consider the Section 3553(a) factors at the resentencing. D.E. 78. Defendant makes the argument in the context of sentencing-package argument. *Id.* Assuming, without deciding, that Judge Linares would have sentenced Defendant to less time on the substantive drug counts and assuming, without deciding, that the Third Circuit would extend the doctrine to counts remanded for resentencing (rather than remanding when counts of conviction are vacated), the Court's analysis would not change. Judge Linares conducted a Section 3553(a) and *Miller* analysis as to Counts One and Two. It was one those counts that Judge Linares imposed 60 years each. In addition, Judge Linares expressly considered and rejected Defendant's argument of a 32-year sentence. Alternately, the Court finds the 60-year sentence on Counts One and Two to be appropriate regardless of the sentence on Counts Four, Five, and Six.